UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 09-21212-Civ-GOLD
        (06-20081-Cr-GOLD)
MAGISTRATE JUDGE P. A. WHITE

JUAN MANUEL BERNAL PALACIOS,   :

        Movant,               :

                              :          REPORT OF MAGISTRATE
v.                            :          JUDGE FOLLOWING
                              :          EVIDENTIARY HEARING

UNITED STATES OF AMERICA,     :

        Respondent.           :
_____

Introduction

        This matter is before the Court on the movant's timely filed
motion to vacate pursuant to 28 U.S.C. §2255, attacking his
sentence for conspiracy to launder monetary instruments and
laundering of monetary instruments of specified unlawful activity,
entered following a guilty plea in case no. 06-20081-Cr-Gold.

        The Court has reviewed the motion (Cv-DE#1), the government's
answer (Cv-DE#11), the movant's reply (Cv-DE#12), the Pre-sentence
Investigation Report (PSI), and all pertinent portions of the
underlying criminal file.

Claims Raised

        Construing the movant's arguments liberally as afforded pro se
litigants pursuant to Haines v. Kerner, 404 U.S. 419 (1972), the
movant appears to raise the following claims in his §2255 motion:

1

1.   The movant is actually innocent of all the charges, since no factual basis existed to accept his guilty plea or impose a sentence. (Cv-DE#1:4).

2.   The movant asserts based upon the Supreme Court's decision in <u>United States v. Santos</u>, his sentence must be vacated. (Cv-DE#1:5).

3.   The movant was denied effective assistance of counsel when his attorney failed to raise the arguments set forth in claims one and two. (Cv-DE#1:6).

4.   The movant's guilty plea was not knowingly or voluntarily entered because he was unaware that <u>Santos</u> was pending before the United States Supreme Court. (Cv-DE#1:7).

5.   Whether counsel fulfilled his duty to consult with the movant and to make reasonable efforts to determine the movant's informed wishes regarding an appeal; and if not, whether the movant suffered any prejudice as a result. (Cv-DE#1:8).

After review of the record, it was determined that evidentiary findings and oral argument was required with respect to **claim five**, as listed above. The movant was represented by Michael Walsh, Esquire at an evidentiary hearing held on February 9, 2010.

Moreover, to the extent the claims raised in his motion are inter-related or duplicative, those issues will be discussed together.

<u>Factual History</u>[1]

From May 2004 to February 2006, the Drug Enforcement Administration conducted an undercover investigation of a large scale money laundering and drug trafficking organization. The organization used a Mexican currency exchange house and U.S. banks to launder drug proceeds from the sale of large quantities of cocaine in Colombia, Mexico and Spain. Ricardo Mauricio Bernal Palacios and his brother, Juan Manuel Bernal Palacios, operated this money laundering and drug trafficking operation originally from Mexico City, Mexico and later from Bogota, Colombia. Camilo Andres Ortiz Echeverri worked for the organization in Colombia, during the entire time of the conspiracy. At sentencing, the Court found that as to Juan Palacios, records revealed he was involved from September 2004 until February 2006.

Around 2002, Ricardo Palacios was originally brought to Mexico City by another individual to launder drug proceeds for that individual. By 2004, Ricardo Palacios became involved in drug trafficking, brokering large maritime shipments of cocaine that were transported to offshore Mexico. There, the loads would be divided and Mexican drug traffickers would send their cocaine to the United States for sale while the Palacios organization would send its share to Europe, including Spain, for sale there. Ricardo Palacios funneled drug proceeds for himself and others, through the currency exchange house called Ribadeo in Mexico City, which he had access to. He also funneled drug proceeds through the currency exchange house called Catorce. Ricardo Palacios directed and controlled money transfers, laundered drug proceeds for Mexican and Colombian cartels, and laundered funds related to his own sales of

---

[1]The factual history was adduced from the Pre-Sentence Investigation report.

large quantities of cocaine in Spain.

In September 2004, Ricardo Palacios' brother, Juan Palacios, approached a confidential source (CS1) in Miami, Florida and asked CS1 to launder proceeds on behalf of the Palacios organization. During the course of the period from 2004 through February 2006, Juan Palacios stayed in frequent contact with the CS1, alerting the CS1 to the wire transfers, discussing rates of exchange, and other day-to-day operational concerns regarding the laundering scheme. Juan Palacios was recorded speaking with the CS1 regarding the money laundering activities on over 60 occasions. Juan Palacios also used email communications on an email account in a nominee name to stay in touch with CS1 and to provide CS1 wire-transfer instructions.

Ortiz was the Palacios organization's representative in Colombia. When the laundered funds arrived in Colombia, Ortiz met with two confidential sources (CS3 and CS4) in Colombia and picked up the money. During each meeting, Ortiz took custody of large amounts of cash. He was responsible for holding onto the money until he received instructions from Ricardo Palacios, regarding where the money would be transported. The laundered funds were ultimately delivered by Ortiz to Colombian drug traffickers.

In September 2004, CS1 was approached by Juan Palacios on behalf of Ricardo Palacios to launder money through the Black Market Peso Exchange (BMPE) in Miami. During that same time, CS1 met with Ricardo Palacios and Juan Palacios in Mexico City. Ricardo Palacios asked if CS1 could handle the movement of money from the United States to Colombia and CS1 informed Ricardo Palacios that his request could be accommodated. Ricardo Palacios explained he owned Ribadeo in Mexico City and that funds from Ribadeo would be

4

transferred to an account bearing the same name at the Union Bank of California. From that account, Ricardo Palacios would then personally conduct or direct the wire transfer of funds to an account designated by CS1 in Miami, which was in fact a DEA undercover account. Thereafter, it was the responsibility of CS1 to repatriate the funds from the United States to Ortiz, in Bogota. For this service, Ricardo Palacios agreed to pay CS1 a commission of three percent of the value of the funds transferred. Ricardo Palacios also told CS1 that if CS1 was successful with the wired funds, there was approximately €7,000,000, which were drug funds located in Spain that also needed to be repatriated back to either Colombia or Mexico.

Upon CS1's return to Miami, Juan Palacios began to conduct or directed the wire transfer of funds to the Miami bank account designated by CS1. Upon receipt, CS1 routed the funds to identified currency traffickers in the greater South Florida area. These suspected currency traffickers then requested that CS1 obtain cashier's checks in the name of various computer or auto part exporters in the Greater Miami metropolitan area. It is believed that merchandise such as computer hardware and auto parts were then purchased and shipped to Bogota. In Bogota, the merchandise was sold on the black market, realizing currency in the form of Colombian pesos. This method of laundering money, referred to as the BMPE, allowed for the transfer of drug proceeds to Colombia without U.S. dollars ever leaving the United States. The cycle of laundering drug proceeds was complete when the Colombian pesos are delivered to Colombian drug traffickers.

In the instant offense, after the cashier's checks were delivered to the exporters in the Miami metropolitan area, the exporters' corresponding counterparts in Colombia delivered the

value of the cashier's check to CS3 and CS4 in Bogota. These sources then delivered the Colombian pesos to Ortiz, who in turn delivered the funds to the Colombian drug traffickers. Through this process, the Palacios organization completed the production, importation and sale of cocaine as well as the laundering and reinvestment of drug proceeds.

From October 15, 2004 through May 2, 2005, the Palacios organization was responsible for wire transfers totaling $1,524,605.30 from the Ribadeo bank account in California to the DEA undercover bank account in Florida. There were 30 wire transfers ranging in amounts from $12,106 to $85,115.10 during that time period. Those funds, less the pre-agreed commission, were funneled through the BMPE, for eventual delivery to Ortiz in Bogota. Ortiz then delivered the funds in the form of Colombian pesos to the Colombian drug traffickers or otherwise used the funds at Ricardo Palacios' direction.

In May 2005, Ricardo and Juan Palacios began to conduct or directed the wire transfer of funds from the Catorce bank account in Curacao to the same DEA undercover bank account in Florida. From May 20, 2005 through September 28, 2005, the Palacios organization was responsible for wire transfers totaling $992,521.73 from the Cartoce bank account to the DEA undercover bank account in Miami. There were 17 wire transfers ranging in amounts from $15,688 to $89,500.23 during that time period. These funds, less the pre-agreed upon commission, were also funneled through the BMPE, for eventual delivery to Ortiz in Bogota. In turn, Ortiz delivered the funds to the Colombian drug traffickers or otherwise used the funds as directed by Ricardo Palacios.

In January 2005, following the successful transfer of the

first 19 transactions by CS1 to Bogota, Ricardo Palacios requested that CS1 travel to Madrid, Spain, to pick up €1,000,000. On February 21, 2005, CS1, along with a DEA undercover agent (UCA), traveled to Spain to accommodate Ricardo Palacios' request.

In early 2005, Ricardo Palacios was also in contact with another confidential source in Mexico (CS2). Ricardo Palacios had previously explained to CS2 that he and others were smuggling large multi-hundred kilograms loads of cocaine to Spain for sale in Europe. Ricardo Palacios requested that CS2 travel to Spain and act as his representative for the purpose of assisting him with the collection of drug proceeds and the transportation of those proceeds back from Spain to Mexico or Colombia. Once CS2 arrived in Spain, CS2 was placed in contact with other members of the Palacios organization, including Jose Bahamon-Ramirez, an unindicted co-conspirator.

On March 1, 2005, after establishing contact with CS2 in Spain, CS1 and DEA UCA traveled to Barcelona, Spain, where CS1 and the DEA UCA picked up €399,060 from Bahamon. The following day, Ricardo Palacios' contact directed CS1 to another location in Madrid, to pick up another €300,000. However, after several attempts, the pick up of €300,000 never materialized. On March 4, 2006, €399,060 was transported by the DEA UCA back to the United States.

On March 9, 2005, €399,060 was converted into approximately $511,993 and deposited into the DEA undercover account. It is noted that the $511,993 was included in the 47 transactions discussed above. Installments of these funds were later wire transferred to other co-conspirators or drug traffickers, per Ricardo and Juan Palacios' instruction or funneled through the BMPE for eventual

delivery to Ortiz in Bogota.

Following the €399,060 picked up in Spain, Spanish customs authorities detained the occupants and searched the contents of a Gulfstream IV jet, chartered from California to Barcelona, in Barcelona. Inside the jet, Spanish law enforcement officers discovered and seized €5,500,000. One of the passengers, a Mexican national residing legally in Los Angeles, California, was allowed to return to the United States via Monterrey, Mexico. The DEA's investigation later revealed that €5,500,000 belonged to the Palacios organization.

Subsequent to the delivery of €399,060 in Barcelona, Spain law enforcement began to conduct surveillance on Bahamon and other members of a money laundering cell operating in Spain. Further surveillance of those members led Spanish law enforcement officers to a warehouse identified as Maritima Istmo, S.L. Information from Spanish customs indicated that shipments of merchandise listed as "dock bumpers" had been sent to the Maritima warehouse on as many as 50 prior occasions with another shipment due on March 22, 2005. On March 22, 2005, a search of the warehouse by Spanish law enforcement resulted in the seizure of approximately 2,000 kilograms of cocaine, €7,400,000 in cash and the arrest of eight persons, including Bahamon, all of whom were part of the money laundering/drug trafficking operation.

In April 2005, CS1 met with Ricardo and Juan Palacios in Mexico City. During that meeting, CS1 inquired about returning to Spain to conduct another pickup of Eurodollar currency; however, Ricardo Palacios stated that CS1 could not return to Spain at that time. Ricardo Palacios explained that just after CS1 returned with €399,060, approximately €5,000,000 belonging to him was seized by

Spanish law enforcement officers from a jet in Barcelona. Ricardo Palacios also told CS1 that he believed the pilot was a U.S. law enforcement informant. Ricardo Palacios told CS1 that a few weeks later, the Spanish police raided the warehouse and seized the equivalent of €65,000,000. The €65,000,000 included the €7,400,000 seized by Spanish law enforcement, and the remainder was the equivalent of proceeds expected to be generated from the sale of approximately 2,000 kilograms of cocaine in the European market.

Another unindicted co-conspirator involved in the money-laundering scheme was Anton Perez, who was an officer for Ribedeo. Perez was murdered in 2005. There were also at least two unindicted co-conspirators residing in Spain during the time of the conspiracy, who wire-transferred drug proceeds at Ricardo Palacios' direction from bank accounts in Spain to bank accounts in Mexico and the United States and/or who smuggled drug proceeds from Spain to Mexico City. These funds were realized from the sale of cocaine in Spain belonging to the Palacios organization. CS2 met with one of these individuals during the time of the Euro pickup in March 2005 and learned from this information from him.

In September 2005, during a meeting between CS1 and Ricardo and Juan Palacios, CS1 was told by Ricardo Palacios that recently several of the "fast boats" containing drugs were intercepted by Mexican law enforcement authorities. According to CS1, Ricardo and Juan Palacios, fearing reprisal and possible abduction by the Mexican Federal Police, abruptly left Mexico City. Ricardo and Juan Palacios subsequently returned to their native Colombia where their illegal trafficking activities in concert with Ortiz continued until they were arrested on March 2, 2006. Juan Palacios and Ortiz were both aware that the source of the funds was from narcotics trafficking.

The funds that were laundered throughout the instant offense were derived from narcotics trafficking proceeds. Ricardo Palacios laundered funds that were derived from Mexican cartels and also his foreign cocaine distribution. A total of $1,517,127.03 was laundered by the Palacios organization during the instant offense. Although €12,900,000 of Palacios organization money was seized by Spanish law enforcement, which is the equivalent of about $17,028,000, the government cannot prove those funds were laundered.

<u>Procedural History</u>

The procedural history of the underlying criminal case reveals that on February 7, 2006, the grand jury returned an indictment charging the movant with conspiracy to launder monetary instruments, in violation of 18 U.S.C. §1956(h) (Count 1); laundering of monetary instruments of specified unlawful activity, in violation of 18 U.S.C. §1956(a)(1)(A)(i) (Counts 2-31); laundering of monetary instruments of specified unlawful activity, in violation of 18 U.S.C. §1956 (a)(2)(A) (Counts 32-48) and conspiracy to distribute a controlled substance, five kilograms or more of a mixture and substance containing a detectable amount of cocaine, and to possess with intent to distribute a controlled substance, in violation of 21 U.S.C. §841(a)(1); all in violation of 21 U.S.C. §846. (Cr-DE#3).

On August 28, 2007, the movant, by way of a plea agreement, pleaded guilty to Counts 1, 2-31, 32-47 and 48. (Cr-DEs#87,88). The government subsequently dismissed Count 49. (Cr-DEs#88,156).

A PSI was prepared in anticipation of sentencing wherein the probation officer determined that the movant's base offense level

10

was 26 pursuant to U.S.S.G. §2B1.1(b)(1)(J). (PSI¶36). Moreover, because the defendant knew or believed that the laundered funds were the proceeds of, or were intended to promote an offense involving the manufacture, importation or distribution of a controlled substance or listed chemical, his base offense was increased by six levels. (PSI¶37). Likewise, because the defendant was in the business of laundering funds, the offense level was increased by four levels. (PSI¶38). However, because the movant clearly demonstrated acceptance of responsibility for his offense, his base offense level was decreased by three levels. (PSI¶¶44,45). The movant's total base offense level was set at 33. (PSI¶46).

The probation officer further determined the movant had zero criminal history points and a criminal history category of I. (PSI¶49). Based on a total offense level of 33 and a criminal history category of I, the movant's guideline range was 135 to 168 months. (PSI¶86).

On May 22, 2008, the movant was sentenced to 135 months imprisonment, followed by two years of supervised release and an assessment of $4,800. (Cr-DE#156). Count 49 was dismissed. (Id.). The Clerk entered judgment on May 28, 2008. (Cr-DE#159). The judgment of conviction became final at the latest on June 11, 2008, ten days after the entry of judgment, when time expired for filing a notice of appeal.[2] This motion to vacate was timely filed less

---

[2]Where, as here, a defendant does not pursue a direct appeal, the conviction becomes final when the time for filing a direct appeal expires. Adams v. United States, 173 F.3d 1339, 1342 n.2 (11th Cir. 1999).  The time for filing a direct appeal expires ten days after the judgment or order being appealed is entered.  Fed.R.App.P. 4(b)(1)(A)(I).  The judgment is "entered" when it is entered on the docket by the Clerk of Court.  Fed. R. App. P. 4(b)(6).  On December 1, 2002, Fed.R.App.P. 26; which contains the rules on computing and extending time, was amended so that intermediate weekends and holidays are excluded from the time computation for all pleadings due in less than 11 days.

than one year later.

## Waiver of Claims

Before turning to a discussion of the claims on the merits, it should first be noted that the movant waived his right to contest all nonjurisdictional defects and defenses, when he entered into a knowing and voluntary guilty plea. It appears the movant contends the sentence he received, along with counsel's failure to file a direct appeal, or at least counsel's failure to consult with him in respects thereto. It is well-settled that sentence appeal waivers are valid if made knowingly and voluntarily. Williams v. United States, 396 F.3d 1340, 1341 (internal citation omitted). The Eleventh Circuit has held that "[a] valid sentence-appeal waiver, entered into voluntarily and knowingly, pursuant to a plea agreement, precludes the defendant from attempting to attack, in a collateral proceeding, the sentence through a claim of ineffective assistance of counsel during sentencing." Williams v. United States, 396 F.3d 1340, 1341 (11th Cir. 2005); see also, Leach v. United States, 171 Fed. Appx. 765 (11th Cir. 2006); Johnson v. United States, 2007 WL 4615236 *5-6 (S.D. Fla. 2007).

In this case, the movant's waiver of his right to collateral attack is valid and enforceable. The record demonstrates that this Court specifically questioned movant about the waiver and he understood its significance. (Cv-DE#11,Ex.5:29). In particular, the Court reviewed the three conditions in which the movant would be able to appeal his sentence. (Id.). The Court also warned the movant that if none of the conditions occur, then the movant's right to appeal the sentence imposed was waived. (Id.). Therefore, the waiver of his right to collaterally attack his sentence is enforceable, and the Court need not reach the merits of the

12

movant's arguments relating to his sentence as found in his claims. <u>Williams v. United States</u>, 396 F.3d 1340, 1341.  As noted by the <u>Williams</u> court, to hold otherwise would permit the movant "to circumvent the terms of the sentence-appeal waiver simply by recasting a challenge to his sentence as a claim of ineffective assistance, thus rendering the waiver meaningless." <u>Williams</u>, <u>supra</u>.  Notwithstanding, the claims will be addressed briefly on the merits below.

Moreover, to ensure that a plea is voluntary and knowing, Fed.R.Cr.P. 11(b)(1) states that "the court must address the defendant personally in open court before accepting the plea and inform the defendant of, and determine that the defendant understands . . . the nature of each charge to which the defendant is pleading." <u>Gordon v. United States</u>, 496 F.3d 1270, 1277 (11th Cir. 2007). The rule imposes upon a district court the obligation and responsibility to conduct a searching inquiry into the voluntariness of a defendant's guilty plea. <u>Id.</u> (citations omitted).

Thus, "[a] court accepting a guilty plea must comply with Rule 11 and specifically address three 'core principles,' ensuring that a defendant (1) enters his guilty plea free from coercion, (2) understands the nature of the charges, and (3) understands the consequences of his plea." <u>United States v. Moriarty</u>, 429 F.3d 1012, 1019 (2005). In <u>Moriarty</u>, the Eleventh Circuit specifically held as follows:

> [t]o ensure compliance with the third core concern, Rule 11(b)(1) provides a list of rights and other relevant matters about which the court is required to inform the defendant prior to accepting a guilty plea, including: the right to plead not guilty (or persist in

13

such a plea) and to be represented by counsel; the possibility of forfeiture; the court's authority to order restitution and its obligation to apply the Guidelines; and the Government's right, in a prosecution for perjury, to use against the defendant any statement that he gives under oath.

Id.

Review of the change of plea proceedings reveals that the court conducted a thorough Rule 11 proceeding. (Cv-DE#11,Ex.5). At that time, the movant acknowledged under oath[3] that he was satisfied with counsel's representation, and that he had discussed all things necessary and the indictment was translated for him from English to Spanish for his understanding. (Id.:8,10). The court advised and the movant acknowledged the potential consequences of entering a guilty plea. (Id.:26-29). The movant denied that anyone has made any promise or guarantee as to what his actual sentence would be from the Court. (Id.:28). The movant also denied being forced, threatened or coerced into changing his plea. (Id.:30). Moreover, the movant acknowledged that his signature appeared on the written plea agreement and it was signed by his own free will. (Id.). The court further advised the movant of the essential elements of the offenses, as well as, how the sentencing guidelines could potentially affect the outcome of his sentence. (Id.:16-23,27-29). Likewise, the Court advised the movant of all the rights he waived as a result of pleading guilty, which included the right to plead not guilty, to have a trial by jury, to see and hear all

---

[3]The law is clear that "solemn declarations in open court carry a strong presumption of verity," forming a "formidable barrier in any subsequent collateral proceedings." Blackledge v. Allison, 431 U.S. 63, 73-74 (1977); United States v. Rogers, 848 F.2d 166, 168 (11th Cir. 1988). The subsequent presentation of conclusory allegations, unsupported by specifics, is subject to summary dismissal, as are contentions which in the face of the record are wholly incredible.   Machibroda v. United States, 368 U.S. 487 (1962).

the witnesses and have them cross-examined, to take the witness stand and testify, to have subpoenas issued to compel witnesses to testify in court and if he was convicted he had the full right to appeal all legal rulings, as well as his conviction, without any restrictions as contained in his plea agreement. (Id.:30-31).

On the record before this court, it is evident that the movant understood the facts and the elements of the offense upon which the charges rested. Moreover, by way of entering into the negotiated plea agreement, the movant was telling his lawyer not to conduct any further investigation and not present at a trial proceeding any legal defenses that he may be entitled to as it relates to his case. Under these circumstances, no showing has been made that the plea was anything but knowing and voluntary. Therefore, the movant's knowing and voluntary guilty plea waived all non-jurisdictional defects and defenses. Thus, he is not entitled to review of his claims, as listed above in this collateral proceeding. Notwithstanding, the claim will be addressed briefly on the merits below.

To the extent the movant means to argue that he was unaware of the consequences of his plea, that claim is also belied by the record. As noted above, the Rule 11 proceeding addressed the consequences of the guilty plea and the sentence appeal waiver. Thus, it is clear that the movant may not collaterally challenge his sentence, as he purports to do so here, in the guise of an ineffective assistance of counsel claim.

There is nothing of record to suggest that the movant did not understand the significance of the waiver of appeal. The record reveals that the waiver did not result in an unlawful denial of his right to appeal, but was rather a part of a lawful, enforceable

agreement between the movant and the government. Under the circumstances presented here, the movant is not only precluded from challenging the manner in which his sentence was imposed, but is also precluded from challenging his sentence in the guise of an ineffective assistance of counsel claim. <u>Williams</u>, <u>supra</u>. Thus, the movant has failed to establish prejudice pursuant to <u>Strickland</u> and is therefore entitled to no relief on these claims.  This will be discussed in detail, <u>infra</u>.

<u>Evidentiary Hearing</u>

In his motion, the movant argues whether counsel fulfilled his duty to consult with the movant and to make reasonable efforts to determine the movant's informed wishes regarding an appeal; and if not, whether the movant suffered any prejudice as a result. (Cv-DE#1:8). At the February 9, 2010 evidentiary hearing, testimony was taken from the movant and his criminal defense attorney, Gustavo Garcia-Montes, Esq.

*Law:*

In order to prevail on a claim of ineffective assistance of counsel, the movant must establish: (1) deficient performance - that his counsel's representation fell below an objective standard of reasonableness; and (2) prejudice - but for the deficiency in representation, there is a reasonable probability that the result of the proceeding would have been different. <u>Strickland v. Washington</u>, 466 U.S. 668 (1984); <u>Chandler v. United States</u>, 218 F.3d 1305 (11th Cir. 2000)(*en banc*). The standard is the same for claims of ineffective assistance on appeal. <u>Matire v. Wainwright</u>, 811 F.2d 1430, 1435 (11th Cir. 1987). A court may decline to reach the performance prong of the standard if it is convinced that the

prejudice prong cannot be satisfied.  <u>Id.</u> at 697; <u>Waters v. Thomas</u>, 46 F.3d 1506, 1510 (11th Cir. 1995).

The Supreme Court has held that counsel has a constitutional duty "to consult with the defendant about an appeal when there is reason to think either (1) that a rational defendant would want to appeal . . . , or (2) that this particular defendant reasonably demonstrated to counsel that he was interested in appealing." <u>Roe v. Flores-Ortega</u>, 528 U.S. 470, 480 (2000). To "consult," means "advising the defendant about the advantages and disadvantages of taking an appeal, and making a reasonable effort to discover the defendant's wishes." <u>Id.</u> at 478; <u>see also</u> <u>Thompson v. United States</u>, 504 F.3d 1203, 1206 (11th Cir. 2007); <u>Gomez-Diaz v. United States</u>, 433 F.3d 788, 792 (11th Cir. 2005).

*Testimony: The movant*

The movant was arrested and extradited to the United States, where he stayed at the Federal Detention Center in Miami, on charges of money laundering.

Eventually, the movant pleaded guilty pursuant to a written plea agreement. Although, the movant acknowledged that his initials appeared at the bottom of every page and the last page contained his signature, he nevertheless testified the contents therein were never read to him. The movant does not speak or write English on any level. However, he admitted counsel generally explained to him the contents of the plea agreement.

Specifically, the movant testified that his attorney explained to him that he maintained his right to appeal if he was sentenced to more than 87 months. Moreover, according to the movant, counsel

17

never explained to him what the right to appeal was, rather, he subsequently learned about said right from other inmates at the detention center.

At the time he signed the plea agreement, the movant was well aware that his appellate rights were subject to three conditions. As part of that understanding, he knew that he could appeal his sentence if it exceeded the guideline limit. It was the movant's belief that his guideline was between 0 up to 20 years imprisonment. Notwithstanding his understanding thereto, he nonetheless testified that pursuant to his plea agreement, his maximum sentence exposure was 87 months imprisonment. Accordingly, because he received a sentence in excess of 87 months, he should have been able to file an appeal.

Moreover, the movant explained that when questioned during the change of plea whether the plea agreement had been read to him he answered yes because he confused the terms "read" and explained."

The movant believed, that despite the appellate waiver contained in the plea agreement, he maintained his right to appeal; a belief based upon the District Court Judge's statements at the conclusion of the sentencing hearing. Therefore, immediately following sentencing, the movant instructed his attorney to file an appeal. However, counsel informed the movant that he could not do so. As such, because the movant believed an appeal was not possible, he neither questioned counsel nor made any attempts to contact the district court.

*Testimony: Counsel*

Attorney Gustavo Garcia-Montes, a seasoned criminal defense

attorney, testified that he was able to communicate with the movant in Spanish. In order to assist his client's understanding of the plea agreement, counsel reviewed a prior draft thereof and upon receipt of the final draft, he visited the movant and read to him the agreement verbatim. Counsel read each paragraph of the plea agreement and after doing so, the contents therein were discussed. Together, the movant and counsel reviewed the plea agreement several times and during the entire process, the movant was aware that the guideline level was at issue.

With respect to the appellate waiver, counsel explained to the movant that he was waiving an important right, the right to appeal. Based on his interactions with the movant, counsel believed his client was fully aware of the conditions under which he waived his right to appeal, which was thereafter acknowledged during the change of plea hearing.

Counsel covered the appellate waiver issue during several meetings prior to the change of plea and he also notified the movant that the judge could sentence him anywhere between the bottom of the guideline range up to 20 years imprisonment. Subsequent to the sentencing hearing, the movant asked counsel what could be done next. Counsel told him nothing could now be done, reminded the movant that he waived his appellate right and that Judge Gold sentenced him within the guideline range. Although, upon hearing this, the movant became quiet and appeared crushed, the movant never directed counsel to file an appeal or at a minimum indicated that he did not understand the results of the proceedings. Despite the appellate waiver and his advice to the movant, counsel nonetheless, within the 10-day period in which to file a direct appeal, researched possible appellate issues, which he eventually concluded were without merit.

19

*Analysis:*

In this case it is disputed whether counsel fulfilled his duty to consult with the movant and to make reasonable efforts to determine the movant's informed wishes regarding an appeal; and if not, whether the movant suffered any prejudice as a result.

Having carefully attended to the testimony at the evidentiary hearing, the witnesses' demeanor and the record as a whole, the undersigned credits the testimony of movant's counsel, Attorney Garcia-Montes, that the movant never directed counsel to file an appeal or indicated he wanted to pursue a direct appeal. The court is not persuaded and finds disingenuous the movant's testimony that despite never inquiring as to the status of his direct appeal, he insisted that counsel file a direct appeal.

Even if it is found that the movant was silent on whether he wished to file an appeal, counsel did not have an absolute duty to consult with the movant the advantages and disadvantages of an appeal. As discussed above, if the record is inconclusive as to whether the defendant requested an appeal and counsel thereafter did not consult with the defendant, counsel's performance is deficient when there is reason to think either (1) that a rational defendant would have wanted to appeal or (2) that this particular defendant reasonably demonstrated to counsel that he was interested in appealing. It is evident from the record that a reasonable defendant in the movant's situation would not have wanted to appeal, as he received a sentence at the low end of the guidelines. Moreover, it is axiomatic that the movant did not reasonably demonstrate to counsel that he was interested in appealing. Under these circumstances, counsel was not ineffective for failing to

file an appeal. It was evident that the movant did not want to go forward with a notice of appeal. Thus, the movant has failed to establish deficient performance or prejudice pursuant to <u>Strickland v. Washington</u>, 466 U.S. 668 (1984).

## Remaining Claims

As will be demonstrated in more detail <u>infra</u>, the movant is not entitled to vacatur on any of the claims presented.[4] When viewing the evidence in this case in its entirety, the alleged errors raised in this collateral proceeding, neither individually nor cumulatively, infused the proceedings with unfairness as to deny the petitioner a fundamentally fair trial and due process of law. The movant therefore is not entitled to habeas corpus relief. <u>See</u> <u>Fuller v. Roe</u>, 182 F.3d 699, 704 (9th Cir. 1999)(holding in federal habeas corpus proceeding that where there is no single constitutional error existing, nothing can accumulate to the level of a constitutional violation), <u>overruled on other grounds</u>, <u>Slack v. McDaniel</u>, 529 U.S. 473, 482 (2000). <u>See also</u> <u>United States v. Rivera</u>, 900 F.2d 1462, 1470 (10th Cir. 1990)(stating that "a cumulative-error analysis aggregates only actual errors to determine their cumulative effect."). Contrary to the movant's apparent assertions, the result of the proceedings were not fundamentally unfair or unreliable. <u>See</u> <u>Lockhart v. Fretwell</u>, 506 U.S. 364, 369-70 (1993).

---

[4]Briefly, the evidence against the movant was more than sufficient to support his conviction. The movant has not shown that the result of the trial, appeal, or sentencing would have been affected had counsel proceeded differently. In other words, no deficient performance or prejudice pursuant to <u>Strickland</u> has been established arising from any of the claims raised in this collateral proceedings, nor has a denial of due process been demonstrated. To the contrary, it is clear after independent review of the record that the movant received a fair trial, and that no constitutional violations occurred. Consequently, he has failed to demonstrate that he is entitled to habeas corpus relief in this collateral proceeding.

Ineffective assistance of counsel claims are subject to the two-part test enunciated in Strickland v. Washington, 466 U.S. 668 (1994), which is not a favorable standard to the movant. See Massaro v. United States, 538 U.S. 500, 505 (2003). To prevail on a claim of ineffective assistance, a movant must demonstrate both that (1) counsel's performance was deficient, meaning that it fell below an objective standard of reasonableness; and (2) the deficient performance prejudiced the defendant. Chandler v. United States, 218 F.3d 1305, 1312-13 (11th Cir. 2000)(en banc), cert. denied, 531 U.S. 1204 (2001). ; Strickland v. Washington, 466 U.S. 668 (1984). Moreover, a habeas court's review of a claim under the Strickland standard is "doubly deferential." Knowles v. Mirzayance, ____ U.S. ____, 129 S.Ct. 1411, 1418, 173 L.Ed.2d 251 (2009). In deciding whether counsel's performance was deficient, judicial scrutiny is "highly deferential" and requires us to "'indulge [the] strong presumption that counsel's performance was reasonable and that counsel made all significant decisions in the exercise of reasonable professional judgment.'" Id. at 1314 (quoting Strickland v. Washington, 466 U.S. at 689-90.

When assessing a lawyer's performance, "[C]ourts must indulge the strong presumption that counsel's performance was reasonable and that counsel made all significant decisions in the exercise of reasonable professional judgment." Chandler v. United States, 218 F.3d 1305 (11th Cir. 2000)(en banc), cert. denied, 531 U.S. 1204 (2001). The court's role in reviewing ineffective assistance of counsel claims is not to "grade a lawyer's performance; instead, [the court] determine[s] only whether a lawyer's performance was within "the wide range of professionally competent assistance." Van Poyck v. Florida Dept. of Corrections, 290 F.3d 1318, 1322 (11th Cir.), cert. denied, 537 U.S. 812 (2002), quoting, Strickland v. Washington, 466 U.S. 668, 690. Review of counsel's conduct is to

22

be highly deferential. <u>Spaziano v. Singletary</u>, 36 F.3d 1028, 1039 (11th Cir. 1994), and second-guessing of an attorney's performance is not permitted. <u>White v. Singletary</u>, 972 F.2d 1218, 1220 (11th Cir. 1992)("Courts should at the start presume effectiveness and should always avoid second-guessing with the benefit of hindsight."); <u>Atkins v. Singletary</u>, 965 F.2d 952, 958 (11th Cir. 1992). A claim of ineffective assistance is a mixed question of law and fact. <u>Strickland</u>, 466 U.S. at 698.

The Eleventh Circuit will not "second-guess counsel's strategy." <u>Chandler</u>, 218 F.3d at 1314, n.14. Strategic choices, even those "made after less than complete investigation," are evaluated for their reasonableness and "counsel's reliance on particular lines of defense to the exclusion of others--whether or not he investigated those other defenses--is a matter of strategy and is not ineffective unless the petitioner can prove the chosen course, in itself, was unreasonable." <u>Chandler</u>, 218 F.3d at 1318 (<u>quoting</u> <u>Strickland</u>, 466 U.S. at 690-91).

The courts "are not interested in grading lawyers' performances;" but rather, "are interested in whether the adversarial process at trial . . . worked adequately." <u>Rogers v. Zant</u>, 13 F.3d 384, 386 (11th Cir. 1994)(quotation marks omitted). To be unreasonable, the performance must be such that "no competent counsel would have taken the action that [the petitioner's] counsel did take." <u>Grayson v. Thompson</u>, 257 F.3d 1194, 1216 (11th Cir. 2001)(emphasis omitted). In other words, "[e]ven if many reasonable lawyers would not have done as defense counsel did at trial, no relief can be granted on ineffectiveness grounds unless it is shown that no reasonable lawyer, in the circumstances, would have done so." <u>Rogers v. Zant</u>, 13 F.3d at 386.

Under the second prong of the test set forth in Strickland, the movant can be said to have been prejudiced by counsel's performance only if there was "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694. Rather, the movant must demonstrate that "there is a reasonable probability that, absent [counsel's] errors, the jury would have had a reasonable doubt regarding [his] guilt." Blackburn v. Foltz, 828 F.2d 1177, 1186 (6th Circ. 1987), cert. den'd, 485 U.S. 970 (1988), see also, Montgomery v. Petersen, 846 F.2d 407, 416 (7th Cir. 1988).

However, it is well settled that tactical or strategic choices by counsel cannot support a collateral claim of ineffective assistance. United States v. Costa, 691 F.2d 1358 (11th Cir. 1982); Coco v. United States, 569 F.2d 367 (5th Cir. 1978). Even if such a decision in retrospect appears incorrect, it can constitute ineffective assistance only "if it was so patently unreasonable that no attorney would have chosen it," Adams v. Wainwright, 709 F.2d 1443, 1445 (11th Cir.), cert. denied, 464 U.S. 1663 (1984), or if the petitioner can demonstrate a "reasonable probability that the verdict [otherwise] would have been different." Kimmelman v. Morrison, 477 U.S. 365, 375 (1986).

Decisions whether to call a particular witness or cross-examine certain witnesses are generally questions of trial strategy. See United States v. Costa, 691 F.2d 1358 (11th Cir. 1982). However, where counsel failed to investigate and interview promising witnesses, and therefore "ha[s] no reason to believe they would not be valuable in securing [defendant's] release," counsel's inaction constitutes negligence, not trial strategy. Workman v.

24

Tate, 957 F.2d 1339, 1345 (6th Cir. 1992)(quoting United States ex rel. Cosey v. Wolff, 727 F.2d 656, 658 n.3 (7th Cir. 1984)). Nevertheless, strategic choices made after thorough investigation of the law and facts relevant to plausible options are virtually unchallengeable. Strickland v. Washington, 466 U.S. at 690-91.

Moreover, it should be noted that the movant's remaining claims could have been, but were not raised on direct appeal. However, a claim of ineffective assistance of counsel may constitute cause for failure to previously raise the issue. United States v. Breckenridge, 93 F.3d 132 (4th Cir. 1996). Attorney error, however, does not constitute cause for a procedural default unless it rises to the level of ineffective assistance of counsel under the test enunciated in Strickland v. Washington, 466 U.S. 668 (1984); Murray v. Carrier, 477 U.S. 478, 488 (1986). Thus, the claims will be identified and treated in this Report, infra.

The Eleventh Circuit will not "second-guess counsel's strategy." Chandler, 218 F.3d at 1314, n.14. Strategic choices, even those "made after less than complete investigation," are evaluated for their reasonableness and "counsel's reliance on particular lines of defense to the exclusion of others--whether or not he investigated those other defenses--is a matter of strategy and is not ineffective unless the petitioner can prove the chosen course, in itself, was unreasonable." Chandler, 218 F.3d at 1318 (quoting Strickland, 466 U.S. at 690-91).

The courts "are not interested in grading lawyers' performances;" but rather, "are interested in whether the adversarial process at trial . . . worked adequately." Rogers v. Zant, 13 F.3d 384, 386 (11th Cir. 1994)(quotation marks omitted). To be unreasonable, the performance must be such that "no competent

counsel would have taken the action that [the petitioner's] counsel did take." Grayson v. Thompson, 257 F.3d 1194, 1216 (11th Cir. 2001)(emphasis omitted). In other words, "[e]ven if many reasonable lawyers would not have done as defense counsel did at trial, no relief can be granted on ineffectiveness grounds unless it is shown that no reasonable lawyer, in the circumstances, would have done so." Rogers v. Zant, 13 F.3d at 386.

Under the second prong of the test set forth in Strickland, the movant can be said to have been prejudiced by counsel's performance only if there was "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694. Rather, the movant must demonstrate that "there is a reasonable probability that, absent [counsel's] errors, the jury would have had a reasonable doubt regarding [his] guilt." Blackburn v. Foltz, 828 F.2d 1177, 1186 (6th Circ. 1987), cert. den'd, 485 U.S. 970 (1988), see also, Montgomery v. Petersen, 846 F.2d 407, 416 (7th Cir. 1988).

However, it is well settled that tactical or strategic choices by counsel cannot support a collateral claim of ineffective assistance.  United States v. Costa, 691 F.2d 1358 (11th Cir. 1982); Coco v. United States, 569 F.2d 367 (5th Cir. 1978).  Even if such a decision in retrospect appears incorrect, it can constitute ineffective assistance only "if it was so patently unreasonable that no attorney would have chosen it," Adams v. Wainwright, 709 F.2d 1443, 1445 (11th Cir.), cert. denied, 464 U.S. 1663 (1984), or if the petitioner can demonstrate a "reasonable probability that the verdict [otherwise] would have been different." Kimmelman v. Morrison, 477 U.S. 365, 375 (1986).

Decisions whether to call a particular witness or cross-examine certain witnesses are generally questions of trial strategy. See United States v. Costa, 691 F.2d 1358 (11th Cir. 1982). However, where counsel failed to investigate and interview promising witnesses, and therefore "ha[s] no reason to believe they would not be valuable in securing [defendant's] release," counsel's inaction constitutes negligence, not trial strategy. Workman v. Tate, 957 F.2d 1339, 1345 (6th Cir. 1992)(quoting United States ex rel. Cosey v. Wolff, 727 F.2d 656, 658 n.3 (7th Cir. 1984)). Nevertheless, strategic choices made after thorough investigation of the law and facts relevant to plausible options are virtually unchallengeable. Strickland v. Washington, 466 U.S. at 690-91.

Moreover, it should be noted that the movant's remaining claims could have been, but were not raised on direct appeal. However, a claim of ineffective assistance of counsel may constitute cause for failure to previously raise the issue. United States v. Breckenridge, 93 F.3d 132 (4th Cir. 1996). Attorney error, however, does not constitute cause for a procedural default unless it rises to the level of ineffective assistance of counsel under the test enunciated in Strickland v. Washington, 466 U.S. 668 (1984); Murray v. Carrier, 477 U.S. 478, 488 (1986). Thus, the claims will be identified and treated in this Report, infra.

In **claim four**, the movant asserts his guilty plea was not knowingly or voluntarily entered because he was unaware that Santos was pending before the United States Supreme Court. (Cv-DE#1:7).

First, the pendency of Santos in the United States Supreme Court had no bearing on whether the movant's guilty plea was knowingly and voluntarily entered. Moreover, Santos, as explained

27

above, is inapplicable to the movant's case.

Finally, as previously discussed <u>supra</u>, the movant entered into a voluntary and knowing guilty plea. As such, the movant cannot now argue that his plea was involuntarily and unknowingly entered into due to a pending case before the Supreme Court.

<u>Conclusion</u>

It is therefore recommended that the motion to vacate be denied.

Objections to this report may be filed with the District Judge within fourteen days of receipt of a copy of the report.

Dated this 17th day of February, 2010.


_____

UNITED STATES MAGISTRATE JUDGE

cc:  Michael D. Walsh, Esq.
     46 NE 6th Street
     Miami, FL 33132
     Phone: 305-444-7700
     Fax: 305-441-1423

     Anne Ruth Schltz, AUSA
     United States Attorney's Office
     99 NE 4 Street
     Miami, FL 33132
     Phone: 305-961-9117
     Fax: 305-530-7941

Anthony W. Lacosta, AUSA
United States Attorney's Office
99 N.E. Fourth Street
Suite 800
Miami, FL 33121
Phone: 305-961-9280
Fax: 305-536-4676